## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **CRIMINAL ACTION NO. 4:13-CR-712** |
| | § | |
| **TROY RAY TRAWEEK** | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court submits the following Findings of Fact and Conclusions of Law pursuant to a bench trial held on August 3, 2015.

Troy Ray Traweek is charged by Indictment with two counts of knowingly employing, using, persuading, inducing, enticing or coercing or attempting to employ, use, persuade, induce, entice or coerce a minor to engage in any sexually explicit conduct for the purpose of producing a visual depiction of such conduct using materials that had been mailed, shipped or transported in interstate or foreign commerce in violation of 18 U.S.C. § 2251(a), (e). (Doc. No. 10.)[1] Mr. Traweek is also charged with one count of knowingly distributing or causing to be distributed any material that contains child pornography using any means or facility of interstate or foreign commerce, including a computer, in violation of 18 U.S.C. § 2252A(a)(2)(B), (b)(1). (*Id.*) Mr. Traweek waived his right to a jury trial under Federal Rule of Criminal Procedure 23(a) with the Government's consent and, after a hearing, the Court's approval. (Doc. No. 50.)

Based on a careful consideration of the record, including the testimony and exhibits, the parties' arguments, and the relevant law, the Court enters the following findings of fact and conclusions of law under Federal Rule of Criminal Procedure 23(c). Based on these findings and

---

[1] All docket references are to Criminal Action Number 4:13-CR-712.

conclusions, the Court will find the defendant, Troy Ray Traweek, guilty of the three counts charged in the indictment.

## I.      BACKGROUND

At the outset of the bench trial, the parties filed four stipulations with respect to certain facts and exhibits. (Doc. No. 57–60.) These facts will be provided in the next section. The Government also introduced several exhibits, which were admitted without objection: (1) Exhibits 1-1 and 1-2 – email messages sent on 9/21/2013 and 9/22/2013 between Mr. Traweek and Detective Sergeant Stuart Butler of the Queensland (Australia) Police Service, who was working undercover at the time; (2) Exhibits 2-1 and 2-2 – an image of minor B.F. and an image of minor S.J. emailed by Mr. Traweek to Detective Sergeant Butler on or about 9/21/2013; (3) Exhibit 3 – AT&T Customer Account details for an IP address belonging to Terry Traweek[2] and a Business Record Certificate; (4) Exhibit 4 – the search warrant authorizing a search of Mr. Traweek's residence; (5) Exhibits 4-1.1 and 4-1.2 – custody receipts for seized property and evidence; (6) Exhibits 4-2 and 4-2.1–4-2.23 – photographs of Mr. Traweek's residence taken during the execution of the search warrant; (7) Exhibit 5 – an Asus desktop computer processing unit and hard drive recovered from Mr. Traweek's residence; (8) Exhibits 5-1 and 5-1.1–5-1.12 – videos of B.F. and S.J. produced by Mr. Traweek; (9) Exhibits 5-2 and 5-2.1–5-2.12 – images of B.F. and S.J. produced by Mr. Traweek; (10) Exhibit 5-4 – a DVD of logs and screenshots from software installed on the Asus desktop computer; (11) Exhibit 6 – a PNY 8 Gigabyte flash drive recovered from Mr. Traweek's residence; (12) Exhibits 6-2 and 6-2.1–6-2.12 – videos of B.F. and S.J. produced by Mr. Traweek; (13) Exhibits 6-3 and 6-3.1–6-3.12 – images of B.F. and S.J. produced by Mr. Traweek; (14) Exhibits 6-4 and 6-4.1–6-4.39 – images of child pornography

---

[2] Terry Traweek, Mr. Traweek's father, was living with Mr. Traweek at the time.

possessed by Mr. Traweek; (15) Exhibit 7 – a Sony Cybershot digital camera recovered from Mr. Traweek's residence; (16) Exhibit 7-1 – video recovered from the Sony Cybershot camera; and (17) Exhibit 8 – the curriculum vitae of Special Agent Jeffery G. Chappell. In addition, the Court admitted the following exhibits over Mr. Traweek's relevance objection: (1) Exhibits 5-3 and 5-3.1–5-3.67 – images of child pornography[3] possessed Mr. Traweek and (2) Exhibits 6-1 and 6-1.1–6-1.65 – videos of child pornography possessed by Mr. Traweek.

At trial, the Government called two witnesses, Deputy Nassar Foty and Special Agent Jeffery Chappell. Deputy Foty is a deputy in the Harris County Precinct 4 Constable's Office. He testified that, in 2013, he was assigned to the High Tech Crime Unit in the Internet Crimes Against Children Taskforce as an investigator. In this capacity, he reviewed information that was sent to his office from the Queensland Police Service. Deputy Foty testified that Mr. Traweek sent Exhibits 2-1 and 2-2 to Australian authorities working undercover using the email address explicitcure2008@yahoo.com. Deputy Foty described Exhibit 2-1 as the buttocks of a prepubescent child in a bedroom and noted that the photograph appeared to have been taken using a hidden camera. Deputy Foty described Exhibit 2-2 as a full frontal image of a nude prepubescent child in a bathroom that also appeared to have been taken with a hidden camera. He testified that the focal point of Exhibit 2-2 was the genital area. Deputy Foty also testified that the Australian authorities provided him with another email address used by Mr. Traweek, besttrader69@gmail.com.

On cross-examination, Deputy Foty acknowledged that Exhibit 2-1 was not a picture of the genitals or pubic area of a person. He also acknowledged that Exhibit 2-2 did not depict a

---

[3] Although Mr. Traweek stipulated that most of these images were child pornography, the following eleven exhibits were not subject to this stipulation: Exhibits 5-3.7, 5-3.10, 5-3.11, 5-3.12, 5-3.20, 5-3.23, 5-3.27, 5-3.29, 5-3.30, 5-3.34, and 5-3.49.

person engaged in actual or simulated sexual intercourse, bestiality, sadistic or masochistic abuse, or knowing lascivious exhibition of the genitals or pubic area.

The Government's second witness, Special Agent Chappell, is a computer forensic analyst assigned to the cyber investigation group of Homeland Security Investigations. The Government tendered Special Agent Chappell as an expert in forensic computer examinations, with no objection.

Special Agent Chappell testified that he recovered twelve videos and twelve still images of minors B.F. and S.J. from Mr. Traweek's computer. He explained that the still photographs were created by taking a snapshot of a particular image in the videos. Special Agent Chappell noted that Exhibit 2-1, which was sent to the Australian authorities, was a still image from Exhibit 5-1.6 and that Exhibit 2-2, which was also sent to the Australian authorities, was a still image from either Exhibit 5-1.7 or 5-1.8. Special Agent Chappell testified that the videos of B.F. and S.J. in the bathroom, which were recovered from Mr. Traweek's computer, appeared to have been taken by a camera hidden in a toilet brush holder or a camera placed between the sink cabinet and the toilet. He noted that the cameras in the bathroom were placed on the ground and angled upwards. He further observed that, in the majority of the videos, the children's faces are largely absent and the images are taken from waist or breasts down.

Special Agent Chappell also testified that he found sixty-seven images of child pornography on Mr. Traweek's computer.[4] He opined that the majority of the images shared a number of characteristics – the age and gender of the child, and the position and angle at which

---

[4] As noted above, Mr. Traweek stipulates that most, but not all, of these images constitute child pornography. The Court need not resolve whether the eleven disputed images satisfy the federal definition of child pornography and merely uses the term "child pornography" here for ease of description.

the child was photographed. (Tr. 88:4-9.) For example, he testified that Exhibit 5-3.5 was the image of a prepubescent child lying on a bed. The image was taken from a downward angle and the focus of the image was on the child's genitalia and hip area. Special Agent Chappell also noted that some of the photographs depicted similar types of sexual activity. (*Id.*) Finally, Special Agent Chappell compared Exhibit 5-3.48, one of the downloaded images of child pornography recovered from Mr. Traweek's computer, to Exhibit 5-2.11, a still image produced by Mr. Traweek. Special Agent Chappell concluded that the two images had a very similar focal point, camera angle, and positioning. He testified that the only difference he observed between the photographs was that the child depicted in the downloaded image was lying down.

Additionally, Special Agent Chappell testified that he used a program called Spyrex Keylogger on Mr. Traweek's seized desktop to recover the password for encrypted files on Mr. Traweek's computer. Because this program records a user's keystrokes and takes screenshots of the monitor whenever there is a change in activity, Special Agent Chappell was able to make a report with all of the logs and screenshots from Mr. Traweek's computer. Special Agent Chappell's forensic analysis was based on computer activity between August 19, 2013, and October 13, 2013. The Government used screenshots from Special Agent Chappell's report as a demonstrative aid. One such screenshot depicted the returns of a Google search. Special Agent Chappell testified that he believed Mr. Traweek had searched for information on how to make a "jailbait bathroom video[]." (Tr. 92:15-20.) Special Agent Chappell also testified that, based on another screenshot from the Keylogger program, he believed that Mr. Traweek searched for information about how to take screenshots of a video. Special Agent Chappell testified that a number of the screenshots from the Keylogger program depicted emails between Mr. Traweek and other unknown individuals (including one identified only as Mark Trader) about trading

images of child pornography. The screenshots indicate that Mr. Traweek uploaded images to a file sharing site, emailed child pornography to himself, received child pornography via email from others, and asked Mark Trader via email for pictures or videos in which a child is being penetrated by either a foreign object or body part. One of the images that Mr. Traweek uploaded to the file sharing site was visually identical to the image sent to the undercover Queensland police officer. Special Agent Chappell testified that the screenshots from the Keylogger program indicate that Mr. Traweek uploaded Exhibits 5-1.1–5-1.12, the videos he recorded of B.F. and S.J.

Finally, Special Agent Chappell opined that, on or about September 21, 2013, Mr. Traweek distributed child pornography via the Internet through Dropbox and in emails to the undercover Queensland police officer, Mark Trader, and other unknown recipients. He indicated that most of this activity occurred between August 19, 2013, and October 13, 2013.

On cross-examination, Special Agent Chappell testified that B.F. and S.J. do not appear to know that they are being filmed in the images and videos of them. He also stated that he did not know which images were transmitted by Mr. Traweek on September 21, 2013.

Mr. Traweek did not call any witnesses. Instead, at the close of the Government's case-in-chief, he moved for judgment of acquittal on the distribution count of the indictment. After oral argument on Mr. Traweek's motion, the Court granted the parties an opportunity to brief the matter. Having reviewed the evidence presented at trial and the post-trial briefing, the Court submits the following Findings of Fact and Conclusions of Law.

## II.    STIPULATED FACTS

The parties stipulated to the following[5]:

1.  The defendant, Troy Ray Traweek, on or between July 1, 2013 and October 16, 2013, did knowingly possess Government's Exhibit 5, a Black Asus Desktop Computer and Hitachi Deskstar 250 Gigabyte hard drive that he knew contained 67 images which have been assigned Government Exhibit numbers 5-3 through 5-3.67;

2.  The defendant, Troy Ray Traweek, on or between July 1, 2013 and October 16, 2013, did knowingly possess Government's Exhibit 6, a PNY 8 Gigabyte flash drive that he knew contained 65 videos which have been assigned Government Exhibit numbers 6-1 through 6-1.65 and thirty-nine images, which have been assigned Government Exhibit numbers 6-4 through 6-4.39;

3.  Government's Exhibits 5 and 6 have been mailed, shipped, or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or were produced using material that had been mailed, shipped, or transported by any means of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer;

4.  The defendant, Troy Ray Traweek, on or about October 16, 2013, within the Southern District of Texas, did knowingly possess Government's Exhibit 5, a Black Asus Desktop Computer and Hitachi Deskstar 250 Gigabyte hard drive that he knew contained Government's Exhibit 5-3.8, which is a visual depiction of a minor engaging in sexually explicit conduct as alleged in the indictment;

---

[5] The stipulated facts in this section are taken verbatim from the parties' filings. (Doc. Nos. 57, 59–60.)

5.  The image in Government's Exhibit 5-3.8 is of a minor under 18 years of age engaging in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2);

6.  The defendant, Troy Ray Traweek, knew that the image in Government's Exhibit 5-3.8 was child pornography depicting sexually explicit conduct and that at least one of the persons engaged in the sexually explicit conduct was a minor under 18 years of age;

7.  The 12 videos assigned Government's Exhibits 5-1 through 5-1.12 and 6-2 through 6-2.12 which were knowingly produced and possessed by defendant, Troy Ray Traweek, on or between July 1, 2013 and October 16, 2013, within the Southern District of Texas, visually depict either a minor female, hereinafter identified as "B.F.," a minor female, hereinafter identified as "S.J.," or both, who were persons under twelve years of age at the time the videos were knowingly produced and possessed by the defendant;

8.  The 12 images assigned Government's Exhibits 5-2 through 5-2.12 and 6-3 through 6-3.12, which were knowingly produced and possessed by defendant, Troy Ray Traweek, on or between July 1, 2013 and October 16, 2013, within the Southern District of Texas, visually depict either minor female B.F. minor female S.J., or both, who were persons under twelve years of age at the time the images were knowingly produced and possessed by the defendant;

9.  The defendant, Troy Ray Traweek, on or between July 1, 2013 and October 16, 2013, did knowingly possesses Government's Exhibit 7, a Sony Cybershot digital camera;

10. The defendant, Troy Ray Traweek, on or between July 1, 2013 and October 16, 2013, did knowingly produce and possess a video, assigned Government's Exhibit 7-1, which depicts the defendant concealing Government's Exhibit 7 in a bathroom for the purpose of producing videos of minor females B.F. and S.J.;

11. The defendant, Troy Ray Traweek, on or between July 1, 2013 and October 16, 2013, did knowingly produce and possess 12 videos containing visual depictions of either B.F., S.J., or both assigned Government Exhibits 5-1 through 5.1-12 and 6-2 through 6-2.12;

12. The defendant, Troy Ray Traweek, on or between July 1, 2013 and October 16, 2013, did knowingly produce and possess 12 images containing visual depictions of either B.F., S.J., or both, assigned Government Exhibits 5-2 through 5-2.12 and 6-3 through 6-3.12;

13. The defendant, Troy Ray Traweek, on or between July 1, 2013 and October 16, 2013, did knowingly use a means or facility of interstate or foreign commerce, namely the Internet, to distribute two images containing visual depictions of B.F. and S.J. assigned Government Exhibits 2 through 2-2;

14. The female minor B.F. is a person who was six years old at the time the defendant, Troy Ray Traweek, produced 12 videos and 12 images containing visual depictions of either B.F., S.J., or both assigned Government Exhibits 5-1 through 5-1.12 and 6-2 through 6-2.12 and Government Exhibits 5-2 through 5-2.12 and 6-3 through 6-3.12; and

15. The female minor S.J. is a person who was eight years old at the time the defendant, Troy Ray Traweek, produced 12 videos and 12 images containing visual depictions of either B.F., S.J., or both assigned Government Exhibits 5-1 through 5-1.12 and 6-2 through 6-2.12 and Government Exhibits 5-2 through 5-2.12 and 6-3 through 6-3.12;

16. B.F.'s date of birth is 07/05/2007;

17. S.J.'s date of birth is 06/20/2005;

18. The minor females present in Government's Exhibits 5-1 through 5-1.12 and 6-2 through 6-2.12 and Government Exhibits 5-2 through 5-2.12 and 6-3 through 6-3.12 are either B.F, S.J., or both;

19. The images assigned Government Exhibit numbers 5-3.1 through 5-3.6, 5-3.8, 5-3.9, 5-3.13 through 5-3.19, 5-3.21, 5-3.22, 5-3.24, 5-3.25, 5-3.26, 5-3.28, 5-3.31, 5-3.32, 5-3.33, 5-3.35 through 5-3.48, 5-3.50 through 5-3.67, 6-4.1 through 6-4.16, 6-4.18, 6-4.21, 6-4.25, 6-4.27, 6-4.28, 6-4.29, and 6-4.32 through 6-4.39 are child pornography depicting sexually explicit conduct and at least one of the persons engaged in the sexually explicit conduct in each of the aforementioned images was a minor under 18 years of age as defined in Title 18, United States Code, Section 2256(2);[6] and

20. The videos assigned Government Exhibit numbers 6-1.1 through 6-1.65 are child pornography depicting sexually explicit conduct and at least one of the persons engaged in the sexually explicit conduct in each of the aforementioned videos was a minor under 18 years of age as defined in Title 18, United States Code, Section 2256(2).

## III.    ADDITIONAL FINDINGS OF FACT

1. Exhibit 5-1.1 is a video of B.F. using the toilet. The child's genitals are visible for approximately two seconds of the fifty-five second video. The video is taken at an upward angle from a camera facing the toilet.

2. Exhibit 5-1.2 is a video of B.F. using the toilet. The child's buttocks are visible for approximately two seconds of the two minute and twenty second video. The child's buttocks are also partially visible at the edge of the frame for approximately ten seconds. The video is taken at a downward angle from above the toilet.

3. Exhibit 5-1.3 is a video of B.F. using the toilet. The child's buttocks are visible for approximately eight seconds of the one minute and ten second video. Her genitals are

---

[6] To clarify, 18 U.S.C. § 2256(2) defines "sexually explicit conduct."

visible for approximately one second. The video is taken at an upward angle from a camera hidden in a toilet brush holder on the floor facing the toilet.

4. Exhibit 5-1.4 is a video of B.F. and S.J. in the bathroom. S.J. is disrobing and is fully nude, with her genitals visible, for approximately three seconds of the two minute and forty-six second video. She is partially visible while nude for approximately thirty seconds. The video is taken at an upward angle from a camera placed between the sink cabinet and the toilet.

5. Exhibit 5-1.5 is a video of B.F. in the bathroom. She is getting dressed and her genitals are visible for approximately ten seconds of the two minute and fifty second video. The video is taken at an upward angle from a camera placed between the sink cabinet and the toilet.

6. Exhibit 5-1.6 is a video of B.F. and S.J. in a bedroom. B.F. disrobes and her buttocks are visible for approximately eight seconds of the two minute and forty second video.

7. Exhibit 5-1.7 is a video of B.F. and S.J. disrobing and using the toilet. S.J.'s buttocks and genitals are visible in the approximately three minute video. B.F.'s buttocks and genitals are also visible. The video is taken at an upward angle from a camera placed in a toilet brush holder on the ground aimed at the toilet and shower.

8. Exhibit 5-1.8 is a video of B.F. and S.J. disrobing and using the bathroom. Neither child's genitals are visible in the one minute and fifty-two second video. The video is taken at an upward angle from a camera placed in a toilet brush holder on the ground aimed at the toilet and shower.

9. Exhibit 5-1.9 is a video of B.F. and S.J. disrobing and using the bathroom. S.J.'s genitals are visible for approximately fifteen seconds in the two minute and twenty-seven second

video. The video is taken at an upward angle from a camera placed between the sink
cabinet and the toilet aimed at the wall opposite the toilet.

10. Exhibit 5-1.10 is a video of S.J. disrobing and using the bathroom. Her genitals are
visible for approximately five seconds in the one minute and fifty-seven second video.
The video is taken at an upward angle from a camera placed near the floor facing the
toilet.

11. Exhibit 5-1.11 is a video of S.J. using the bathroom. Her genitals are visible for
approximately two seconds in the fifty-three second video. The video is taken at an
upward angle from a camera placed in a toilet brush holder facing the toilet.

12. Exhibit 5-1.12 is a few seconds shorter than Exhibit 5-1.10, but appears to otherwise be
identical to it.

13. Exhibit 2-1is an image of B.F.'s nude buttocks taken in a bedroom.

14. Exhibit 2-2 is a full frontal nude image of S.J. taken in a bathroom. The image is taken at
a slightly upward angle from a camera placed in a toilet brush holder on the floor.

15. Exhibit 5-2.1 is a full frontal nude image of S.J. taken in a bathroom. The image is taken
at a slightly upward angle from a camera placed in a toilet brush holder on the floor.

16.  Exhibit 5-2.2 is an image of the buttocks of a prepubescent child who is bent over in the
process of removing her undergarments. The image is taken in a bathroom at a slightly
upward angle from a camera placed in a toilet brush holder on the floor.

17. Exhibit 5-2.3 is a frontal image of B.F. seated on a toilet. The child is nude from the waist
down and her genitals are visible in the center of the frame. The image is taken at an
upward angle from a camera placed in a toilet brush holder on the floor aimed directly at
the toilet.

18. Exhibit 5-2.4 appears to be identical to Exhibit 5-2.3.

19. Exhibit 5-2.5 is the full frontal nude image of a prepubescent child who is in the process of removing her undergarments. The image is taken in a bathroom at an upward angle from a camera placed between the sink cabinet and the toilet facing the wall opposite the toilet.

20. Exhibit 5-2.6 is the full frontal nude image of B.F. taken in a bathroom. The image is taken at an upward angle from a camera placed between the sink cabinet and the toilet facing the wall opposite the toilet.

21. Exhibit 5-2.7 is the full frontal nude image of B.F. taken in a bathroom. The image is taken at an upward angle from a camera placed between the sink cabinet and the toilet facing the wall opposite the toilet.

22. Exhibit 5-2.8 is the full frontal nude image of B.F. taken in a bathroom. The image is taken at an upward angle from a camera placed between the sink cabinet and the toilet facing the wall opposite the toilet.

23. Exhibit 5-2.9 is the full frontal nude image of S.J. taken in a bathroom. The image is taken at an upward angle from a camera placed between the sink cabinet and the toilet facing the wall opposite the toilet.

24. Exhibit 5-2.10 is an image of the buttocks and genitals of a prepubescent child who is bent over in the process of removing her undergarments. The image is taken in a bathroom at a slightly upward angle from a camera placed in a toilet brush holder on the floor.

25. Exhibit 5-2.11 appears to be identical to Exhibit 5-2.10.

26. Exhibit 5-2.12 is a frontal image of a prepubescent child's genitals. The image is taken in a bathroom at an upward angle from a camera placed facing the toilet.

## IV.   CONCLUSIONS OF LAW

### A.   Sexual Exploitation of Children

Mr. Traweek is charged with two counts of sexual exploitation of children, in violation of 18 U.S.C. § 2251(a), (e) – one count for each child, B.F. and S.J. To find Mr. Traweek guilty of sexual exploitation of children, the Government had to prove beyond a reasonable doubt that:

(1) Mr. Traweek used a minor to engage in sexually explicit conduct;

(2) Mr. Traweek acted with the purpose of producing a visual depiction of such conduct; and

(3) the visual depiction was produced using materials that have been transported in interstate commerce by any means, including by computer.

18 U.S.C. § 2251(a); *see also* Fifth Circuit Pattern Jury Instructions (Criminal Cases) 2.84 (2015).

#### 1.   Stipulated Elements

The parties' stipulations establish certain elements of the Government's case. It is undisputed that B.F. and S.J. were minors when the images were made. It is also undisputed that Mr. Traweek knowingly produced twelve videos and twelve images containing visual depictions of B.F., S.J., or both, using materials transported in interstate commerce. The Court finds that the Government has proven these elements beyond a reasonable doubt.

#### 2.   Whether Mr. Traweek Used B.F. and S.J. to Engage in Sexually Explicit Conduct

The Government also had to prove beyond a reasonable doubt that at least one image of each child produced by Mr. Traweek constituted child pornography; that is, it showed sexually

explicit conduct. Sexually explicit conduct is defined as "actual or simulated--(i) sexual intercourse . . . ; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A). The Government contends that the photographs and videos admitted as evidence depict lascivious exhibition of the genitals or pubic area. Therefore, the issue before the Court is whether the surreptitious videos and the images created from those videos depict the lascivious exhibition of the genitals and pubic area of B.F. and S.J.

a.  Legal Standards

Because § 2256 does not define "lascivious exhibition," courts in this circuit and others apply the six-factor test outlined in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986). *See e.g*, *United States v. Johnson*, 639 F.3d 433, 439–40 (8th Cir. 2011); *United States v. Steen*, 634 F.3d 822, 826 (5th Cir. 2011); *United States v. Grimes*, 244 F.3d 375, 380 (5th Cir. 2001). The *Dost* factors are:

1) whether the focal point of the visual depiction is on the child's genitals or pubic area;
2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
4) whether the child is fully or partially clothed, or nude;
5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;
6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Dost*, 636 F.Supp. at 832. This list "is not exhaustive, and no single factor is dispositive." *Steen*, 634 F.3d at 827 (quoting *Grimes*, 244 F.3d at 380). "Any determination of lasciviousness 'will have to be made based on the overall content of the visual depiction.'" *Id.* (quoting *Dost*, 636 F. Supp. at 832).

The application of the *Dost* factors is not without controversy. *United States v. Frabizio*, 459 F.3d 80, 88 (1st Cir. 2006) ("There are many reasons for the need for caution about the use of the *Dost* factors . . . . First is the fact that the *Dost* factors have fostered myriad disputes that have led courts far afield from the statutory language."). Critics of the *Dost* factors argue that the factors may be overly generous to the defendant or inappropriately limit the scope of the statutory definition. *Id.*; *United States v. Rivera*, 546 F.3d 245, 251 (2d Cir. 2008); *Frabizio*, 458 F.3d at 80; *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir. 1987); *see also Steen*, 634 F.3d at 828 n.1 (Higginbotham, J., concurring) (noting the concerns expressed in *Rivera*, *Frabizio*, and *Wiegand*). The sixth factor – whether the visual depiction is intended or designed to elicit a sexual response in the viewer – is particularly contentious. *United States v. Amirault*, 173 F.3d 28, 34 (1st Cir. 1999). As the *Amirault* court explained, this confusion largely stems from the many unanswered questions implicit in the sixth factor:

> Is this a subjective or objective standard, and should we be evaluating the response of an average viewer or the specific defendant in this case? Moreover, is the intent to elicit a sexual response analyzed from the perspective of the photograph's composition, or from extrinsic evidence (such as where the photograph was obtained, who the photographer was, etc.)?

*Id.*

Circuit courts have answered these questions differently. The circuits are split on whether a court should limit its review to the image itself – the "four corners test" – or whether the court should consider the context in which the image was produced. The Third Circuit has adopted the former approach, limiting its analysis to the image itself. *See United States v. Villard*, 885 F.2d 117, 125 (3d Cir. 1989) (holding, in the context of a sufficiency-of-the-evidence challenge to a jury verdict that, "[w]e must . . . look at the photograph, rather than the viewer. If we were to conclude that the photographs were lascivious merely because [the defendant] found them

sexually arousing, we would be engaging in conclusory bootstrapping rather than the task at hand").

By contrast, the Second and Tenth Circuits consider the context in which the images were produced. *See Rivera,* 546 F.3d at 250 ("[T]hese images have context that reinforces the lascivious impression. [The victim] testified that Rivera arranged the poses and took the photographs. . . . A reasonable jury could therefore find that Rivera composed the images in order to elicit a sexual response in a viewer—himself. These images are unquestionably 'lascivious' material . . . ."); *United States v. Wolf*, 890 F.2d 241, 247 (10th Cir. 1989) (noting that "lasciviousness is not a characteristic of the child photographed but of the exhibition that the photographer sets up for an audience that consists of himself or likeminded individuals"). By considering the context in which the image was taken, courts can "resolve close judgment calls about whether an image inadvertently focuses on a child's genitalia, or whether [the image] is intended to elicit a sexual response in the viewer." *United States v. Brown*, 579 F.3d 672, 684 (6th Cir. 2009). As the Second Circuit has observed, in some situations, it is the "context that reinforces the lascivious impression." *Rivera*, 546 F.3d at 250.

Finally, the Sixth Circuit in *Brown* adopted a "limited context test" that permits "consideration of the context in which the images were taken, but limits the consideration of contextual evidence to the circumstances directly related to the taking of the images." *Brown*, 579 F.3d at 683. The factors the *Brown* court considered were "(1) where, when, and under what circumstances the photographs were taken, (2) the presence of other images of the same victim(s) taken at or around the same time, and (3) any statements a defendant made about the images." *Id.* at 684 (footnote omitted). The *Brown* court explicitly rejected the consideration of factors "such as past bad acts of the defendant, the defendant's possession of other

pornography . . . and other generalized facts that would relate only to the general 'unseemliness' of the defendant." *Id.*

Courts on all sides of the debate have identified the policy considerations animating each approach. If too much emphasis is placed on the subjective intent of the photographer or the viewer, "a seemingly innocuous photograph might be considered lascivious based solely upon the subjective reaction of the person who is taking or viewing it." *Id.* at 683. In adopting a four corners approach, the First Circuit observed that, if the defendant's subjective reaction were relevant, "a sexual deviant's quirks could turn a Sears catalog into pornography." *Amirault*, 173 F.3d at 34. On the other hand, "[i]gnoring the contextual evidence construes the statute too narrowly as it inevitably fails to capture behavior that is 'intended' to exploit children." *Brown*, 579 F.3d at 683; *see also Rivera*, 546 F.3d at 251 ("[L]asciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or likeminded pedophiles."). Moreover, rigid application of a four corners test "could harm criminal defendants in some circumstances by limiting consideration of contextual evidence that would show that images are art or innocent family photographs." *Brown*, 579 F.3d at 683.

Although the Fifth Circuit has yet to expressly weigh in on the circuit split, *Steen* seems implicitly to endorse the use of context in assessing the sixth *Dost* factor. In *Steen*, the Fifth Circuit considered whether a surreptitious video of a minor in a tanning salon constituted a lascivious exhibition of the genitals. The court was asked to determine whether the video was child pornography or simply voyeurism. Reversing the defendant's conviction for production of child pornography, the *Steen* court noted that the defendant's camera included two other films, neither of which contained nudity. *Steen*, 634 F.3d at 828 n.28. These other videos suggested that

it was not the image of the minor's genitals that elicited a sexual response; rather "merely being a voyeur excited Steen." *Id.* at 828. The *Steen* court also cited to a Missouri district court's decision that looked to the available context, including the defendant's conduct in producing the image, to assess whether the videos at issue were intended to elicit a sexual response in the viewer. *Id.* at 828 (citing *United States v. Johnson*, 719 F. Supp. 2d 1059, 1068 (W.D. Mo. 2010)). The *Steen* court concluded that "[w]hen a photographer selects and positions his subjects, it is quite a different matter from the peeking of a voyeur upon an unaware subject pursuing activities unrelated to sex." *Id.* Accordingly, the court held that the tanning salon video was voyeurism, not child pornography.

By considering a defendant's conduct and the other materials in his possession, the *Steen* court appears to follow the Second and Tenth Circuits in condoning the use of context in evaluating the sixth *Dost* factor. Notably, the *Steen* court factored the defendant's other videos into its analysis, a consideration that the Sixth Circuit explicitly has rejected as part of its limited context test. Because this Court believes consideration of context is most consistent with binding Fifth Circuit precedent, it will analyze the images and videos in this case in light of the context in which they were taken.

In his motion, Mr. Traweek argues that the images and videos at issue here cannot constitute sexually explicit conduct, as required by the statute, because B.F. and S.J. were never engaged in or attempting to engage in the actual depiction of a sex act. Accordingly, the images and videos cannot meet the statutory definition. Mr. Traweek grounds his argument in *United States v. Williams*, 553 U.S. 285 (2008), in which the Supreme Court considered an overbreadth challenge to 18 U.S.C. § 2252A(a)(3)(B). As part of its analysis, the *Williams* Court interpreted the first definition of sexually explicit conduct identified in 18 U.S.C. § 2256(2)(A) — actual or

simulated sexual intercourse. The Court found that this definition extended only to the actual depiction of a sex act using real children or the explicit portrayal of a sex act using real children that did not in fact occur due to camera tricks. *Williams*, 553 U.S. at 297. The Court did not, however, extend its analysis to the other definitions of sexually explicit conduct in 18 U.S.C. § 2256(2)(A) — bestiality, masturbation, sadistic or masochistic abuse, and lascivious exhibition of the genitals. Notwithstanding this, Mr. Traweek contends that *Williams* necessitates an acquittal on the charges of production and attempted production of child pornography because B.F. and S.J. never engaged in sexually explicit conduct.

The reasoning in *Williams* does not readily lend itself to this case. First, as noted above, *Williams* considered only one of the definitions of sexually explicit conduct, a definition that is not at issue here. Second, there is no dispute that the images and videos Mr. Traweek produced were of real children engaging in real acts. The mere fact that the children were unaware they were being filmed, and therefore were acting naturally, does not in and of itself render their behavior non-explicit. As made clear by the *Dost* factors, the child's intent is not at issue; rather, the determination of whether an image is a lascivious exhibition of the genitals turns in part of the image and in part on the intent of the producer.

b.  Application of the *Dost* Factors

The Court finds that some of the photographs admitted into evidence depict lascivious exhibitions of B.F. and S.J's genitalia and are child pornography. The Government has met its burden of proof as to Exhibits 5-2.3, 5-2.4, 5-2.10, 5-2.11, and 5-2.12. Since at least one of the photographs in the aforementioned exhibits is of each child, the Court finds Mr. Traweek guilty of both counts of sexual exploitation of children.

i.      Focal Point

When considering whether the visual depiction focuses on the minor's genitals or pubic area, courts consider the position of the camera, whether the zoom feature was utilized to focus on the genital area, and whether the view of the genital area is fleeting or incidental. *See e.g.*, *Johnson*, 639 F.3d at 440 ("A reasonable jury could find from the evidence that Johnson adjusted the zoom feature in an attempt to tighten the focus of the camera on the area where the females' genitals would be if they were to face the camera, and thereby determine that the first *Dost* factor was satisfied."); *Steen*, 634 F.3d at 827 ("First, the focal point of the visual depiction is not on C.B.'s genitalia or pubic area. Her pubic region is only visible for about 1.5 seconds. Moreover, the film did not accent the pubic area — to the contrary, the brief seconds the pubic region is visible, it is on the far side of the image's frame.") (footnote omitted); *United States v. Helton*, No. CR-07-70-T, 2007 WL 1674196, *6 (W.D. Okla. June 7, 2007) ("[T]he evidence shows that the camcorder was positioned in a manner designed to capture visual images of the genital or pubic area; its placement at the floor level with the lens pointing upward and toward the toilet seat results in a focus on those portions of the body of anyone entering the bathroom and sitting on the toilet.").

Many of the surreptitious videos of B.F. and S.J. present a close question on this factor. Although all but two of the videos are shot from hidden cameras placed at floor level with the lens pointing upward,[7] the focal point of videos is not on the children's genitals or pubic area. The children's genitals are visible for only a small fraction of the video recordings and there was no close-up or highlighting of the genitals in any of the video recordings. Thus, although the

---

[7] While Exhibits 5-1.2 and 5-1.6 are both shot by hidden camera, the camera is not placed at an upward angle from the floor.

purpose of the camera's positioning may have been to capture images of the children's genitals, the Court does not find that the focal point of the videos is the genitals or pubic area.

By contrast, the focal point of Exhibits 5-2.3, 5-2.4, 5-2.10, 5-2.11, and 5-2.12 is the genitals and pubic area. In Exhibits 5-2.3 and 5-2.4, the camera is placed on the floor aimed directly at the toilet. As a result, the genitals of the child seated on the toilet are at the center of the frame. Notably, unlike the videos from which they are created, Exhibits 5-2.3 and 5-2.4 depict only the moment when the child's genitals are visible to the viewer. The deliberate emphasis of this fleeting instant strongly suggests that the intended focal point of the image is the genitals and pubic area.

In Exhibits 5-2.10 and 5-2.11, the camera is similarly focused on the toilet from an upward angle. Instead of capturing the genitals of a child seated on the toilet, these photographs capture the child bent over with her back to the camera and her buttocks and genitals exposed at the center of the frame. Finally, Exhibit 5-2.12 is a full frontal nude image of a child from hip-level to mid-calf. Because only the lower portion of the child's body is pictured, the focal point is her genitals and pubic area.

ii.      Sexually Suggestive Setting

All but one of the twelve videos and one of the twelve photographs of B.F. and S.J. are set in a bathroom. Courts have differing views on whether a bathroom is a sexually suggestive setting. *See United States v. Johnson*, No. 2:10-CR-71-FtM-36DNF, 2011 WL 2446567, *8 (M.D. Fla. June 15, 2011) (summarizing cases). Some courts have held that, in order for a bathroom setting to be sexually suggestive, there must be sufficient evidence of the other *Dost* factors; a bathroom setting alone is not sexually suggestive. *See e.g.*, *United States v. Larkin*, 629 F.3d 177, 183 (3d Cir. 2010) ("Here, the fact that B.L. is standing in the tub coupled with her

unnatural pose and the angle of the photograph suggests that the bathtub/shower, in this instance, was meant to convey to the intended viewer that the shower is a location for a potential sexual encounter with B.L.").

In the videos of B.F. and S.J., both children act naturally and use the bathroom for typical activities, such as changing clothes or toileting. Neither child's behavior suggests that the bathroom is a location for sexual activity. Accordingly, the bathroom is not a sexually suggestive setting in the videos.

Like the videos, most of the still images of B.F. and S.J. in Government Exhibits 2-2 and 5-1.1–5-1.12 depict the children conducting typical bathroom activities. The children's nudity is merely incidental to these activities. However, there are three notable exceptions – Exhibits 5-1.10, 5-1.11, and 5-1.12. Exhibits 5-1.10 and 5-1.11 are focused on the buttocks and genitals of a child who is bent over with her back to the camera. The photographs are taken from an upward angle with the child's genitals at the center of the frame. From the image alone, it does not appear that the child is engaged in any routine bathroom activity; all that is apparent is that she is bent over with her buttocks and genitals exposed to the viewer. Exhibit 5-1.12 is taken from hip-level down and similarly focuses predominantly on S.J.'s genitals from an upward angle. Here too, there is no indication that the child's nudity is related to disrobing or toileting. In these three photographs, the composition and the absence of any traditional bathroom activity render the bathroom a sexually suggestive setting.

Unlike bathrooms, bedrooms are frequently associated with sexual activity. *Steen*, 634 F.3d at 827 ("Traditional settings that meet this standard are beds or bedrooms."). However, the setting of a bedroom alone is not necessarily sufficient to support a finding of lasciviousness. *See Villard*, 885 F.2d at 124. In the one video of B.F. and S.J. in a bedroom, the children are seen

disrobing, a commonplace bedroom activity. Nothing in their conduct suggests that the bedroom is a location for sexual activity. Moreover, in the sole still image of B.F. in the bedroom, her genitals and pubic area are not visible. Thus, in Exhibits 2-1 and 5-1.6, the bedroom is not a sexually suggestive setting.

iii.      Unnatural Pose/Inappropriate Attire

It is natural to be nude or partially nude when disrobing or using the bathroom. Because the children were unaware they were being filmed, they did not act unnaturally in the videos and they were not dressed inappropriately. As outlined above, however, two of the still images (Exhibits 5-1.10 and 5-1.11) depict B.F. bent over with her buttocks and genitals exposed to the camera. Although B.F. was unaware she was being recorded, the still images created from the video nevertheless depict her in an unnatural pose. By freezing the video to capture the image of B.F. bent over displaying her buttocks and genitals to the camera, Mr. Traweek created an unnatural pose from otherwise normal bathroom behavior.[8] *Cf. United States v. Horn*, 187 F.3d 781, 790 (8th Cir. 1999) (noting that the act of image manipulation can render an image lascivious even when the larger image from which it was cropped was not lascivious). Without the context provided by the videos from which Exhibits 5-1.10 and 5-1.11 are created, a viewer would be unaware that B.F. was simply disrobing when photographed in this pose. Accordingly, the Court finds that Exhibits 5-1.10 and 5-1.11 depict B.F. in an unnatural pose.

iv.      Nudity

---

[8] The Government argues that the mere possibility that some of videos could have been frozen to create a still image of a child in an unnatural position establishes this *Dost* factor for those videos. This Court disagrees. The *Dost* factors require an examination of a visual depiction and its context. Expanding this inquiry to the hypothetical or potential variations of the depiction risks punishing a defendant for what he could have done.

In all twelve videos, the children are nude for some period of time, either fully or from the waist-down. In all twelve still images, the children are similarly fully or partially nude. Although nudity alone does not constitute the lascivious exhibition of the genitals or pubic area, *Steen*, 634 F.3d at 827, in light of the other *Dost* factors, the children's nudity in these videos and images further supports a finding of lasciviousness.

> v.      Sexual Coyness/Willingness to Engage in Sexual Activity

Because the children were unaware they were being filmed, they did not exhibit sexual coyness or a willingness to engage in sexual activity. *See Steen*, 634 F.3d at 827 ("The fifth factor, suggesting sexual coyness, is irrelevant in this case because C.B. did not know she was being filmed. She neither acts coy nor willing to engage in sexual activity.").

> vi.      Intended/Designed to Elicit Sexual Response

It is clear from the images and the surrounding context that the photographs of B.F. and S.J. were intended to elicit a sexual response. First, there is ample evidence that Mr. Traweek is sexually excited by children. It is undisputed that Mr. Traweek knowingly possessed dozens of videos and images of child pornography.[9] Special Agent Chappell testified that these images share a number of common characteristics – the age and gender of the child depicted, the positioning of the child, and the sexual activity depicted – suggesting that Mr. Traweek has a specific interest in certain children. Moreover, Mr. Traweek sought to trade child pornography with other individuals through the Internet and expressed a desire to have sex with B.F. in a conversation with an undercover police officer. Thus, unlike the defendant in *Steen*, 634 F.3d at 828, it is apparent that Mr. Traweek has a sexual interest in children.

---

[9] The Court does not take a position on whether the eleven disputed images in Exhibit 5-3 constitute child pornography as it is uncontested that, even apart from those images, Mr. Traweek possessed child pornography.

Second, the way the photographs in Exhibits 5-1.1–5.1.12 were created demonstrates that the images were designed to elicit a sexual response in the viewer. Courts have recognized that image manipulation may be evidence of intent to elicit a sexual response in the intended viewer. *See e.g.*, *United States v. Stewart*, 729 F.3d 517, 528 (6th Cir. 2013) ("Although Stewart contends that the act of image manipulation cannot — as a matter of law — render an image lascivious when the larger image from which it was cropped was undisputably not lascivious, his position ignores the case law which holds that a jury may consider evidence of composition, framing, and focus to support a finding of lasciviousness."); *United States v. Boyle*, 700 F.3d 1138, 1145 (8th Cir. 2012) ("As the district court explained in response to Boyle's post-trial motions, the jury 'could have concluded [Boyle's] repeated manipulation of the camera was an attempt to get more sexually suggestive images — images that would elicit a sexual response in the intended viewer.'"). To create the photographs in Exhibits 5-1.1–5.1.12, Mr. Traweek froze the videos at the precise moments the children's genitals and buttocks were exposed and converted those snapshots into separate photographs. Unlike the videos, which capture the children in various stages of dress and undress conducting typical bathroom activities, the photographs exclusively focus on the children partially or fully nude with their genitals, pubic area, and buttocks visible. In fact, the manner in which Exhibit 5-1.11 is framed eliminates any indication that the child is otherwise engaged in usual bathroom activities; all the viewer sees is a prepubescent child bent over with her buttocks and genitals exposed to the camera. Absent the context, the images are significantly more sexually suggestive than the videos from which they were generated.

Third, some of the photographs themselves suggest that they were intended to elicit a sexual response in the viewer. Exhibits 5-2.3, 5-2.4, 5-2.10, 5-2.11, and 5-2.12 all depict the

genitals of the children using a camera angle designed to capture the genitals and the pubic area. As Special Agent Chappell testified, Exhibit 5-2.11 in particular closely mirrors Exhibit 5-3.48, an image that both parties agree is child pornography. Independent of the context this photograph was taken in, the image strongly suggests that it was intended to elicit a sexual response. The child is fully bent over with her legs slightly parted, allowing the viewer to see not only her buttocks but her genitals as well. Because her genitals are near the center of the frame and her face is obscured, the focus of the image is necessarily on her genitals. Exhibits 5-2.3 and 5-2.4 share a similar focus. The camera faces the toilet from floor level with an upward angle and the image depicts a child seated on the toilet with her legs spread apart and her genitals raised slightly above the toilet seat. The child's genitals are at the center of the frame and her face is obscured. Finally, Exhibit 5-2.12 is the frontal nude image of the child's genitals taken from hip-level down. The child is standing with her legs spread apart, exposing her genitals to the camera. Although this Court does not adopt the four corners test in assessing the sixth *Dost* factor, a review of Exhibits 5-2.3, 5-2.4, 5-2.10, 5-2.11, and 5-2.12 demonstrates that the photographs themselves evidence an intent to elicit a sexual response in the viewer.

### B. **Distribution of Child Pornography**

Mr. Traweek is also charged with one count of distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(B), (b)(1). To find Mr. Traweek guilty of distribution of child pornography, the Government had to prove beyond a reasonable doubt that:

> (1) Mr. Traweek knowingly distributed material that contained child pornography, as alleged in the indictment;
>
> (2) The material containing child pornography was transported in interstate commerce by any means, including by computer; and

(3) When Mr. Traweek distributed the material, he knew it contained child pornography.

18 U.S.C. § 2252A(a)(2)(B); *see also* Fifth Circuit Pattern Jury Instructions (Criminal Cases)

2.85E (2015).

1. <u>Whether Mr. Traweek Knowingly Distributed Material That Contained Child Pornography</u>

The Government had to prove beyond a reasonable doubt that Mr. Traweek knowingly

distributed material that contained child pornography. For the reasons discussed in more detail

above, the Court finds that Exhibits 5-2.3, 5-2.4, 5-2.10, 5-2.11, and 5-2.12 constitute child

pornography. Accordingly, the sole remaining question with respect to this element is whether

Mr. Traweek distributed these photographs.

Although the statute does not define "distribute," the Fifth Circuit recently held that

storing child pornography in a shared folder accessible to others on a network amounts to

distribution under 18 U.S.C. § 2252A(a)(2)(B). *United States v. Richardson*, 713 F.3d 232, 236

(5th Cir. 2013). The *Richardson* court cited First and Tenth Circuit cases that construed

distribution of child pornography as delivering, transferring, or dispensing child pornography to

others, or making child pornography available for other to take, when the files are in fact taken.

*Id.* (citing *United States v. Chiaradio*, 684 F.3d 265, 282 (1st Cir. 2012) and *United States v.*

*Shaffer*, 472 F.3d 1219, 1220–21 (10th Cir. 2007)). Under this definition, uploading images of

child pornography to an online file-sharing website accessible around the world, or emailing

child pornography to specific individuals would both constitute distribution.

Special Agent Chappell testified that Mr. Traweek maintained an account on a website

called imgsrc. Special Agent Chappell explained that imgsrc is a picture hosting website where

users can upload images to an account and make those images available to other users, who can

in turn leave comments on the images. (Tr. 83:7-14.) Screenshots of Mr. Traweek's imgsrc

account were saved by the Keylogger software on his computer. One such screenshot captures the images in an album entitled "step daughter." The screenshot displays previews of the photographs in the album. Among the photographs in the album are Exhibits 5-2.3, 5-2.4, and 5-2.11. The album is available to other registered imgsrc users who have photographs of their own to post, and is described with the keywords "[d]aughter, kids, nude, [and] preteen." (Ex. 6-4.)

Other screenshots of Mr. Traweek's computer activity reveal multiple email conversations with unknown individuals discussing trading images and videos using imgsrc and another file-sharing website, Dropbox. In one exchange, Mr. Traweek sends "Joseph Smith" the password for "my album" using his besttrader69@gmail.com email address. [10] (*Id.*) The password, cassie2727, is the same as the password for Mr. Traweek's imgsrc album, "step daughter." As Special Agent Chappell testified, anyone with this password would have access to Mr. Traweek's account. (Tr. 110:22-111:08.) In another email conversation, Mr. Traweek sends "in sign" a link to a Dropbox album. Along with the link, Mr. Traweek included the message, "send videos i [sic] like this stuff. jailbait stuff is awesome." (*Id.*)

Mr. Traweek objects to the introduction of any evidence that he uploaded or shared images with anyone besides the Australian undercover officer. He contends that the Government should be limited to the evidence that it presented to the grand jury on the distribution count in the indictment — the two images of S.J. and B.F. that Mr. Traweek sent the undercover officer during their email conversation. Mr. Traweek further argues that, based on the testimony presented to it, the grand jury could have found probable cause for the distribution of only those images Mr. Traweek sent on September 21, 2013.  Accordingly, the introduction of other

---

[10] At trial, both Deputy Foty and Special Agent Chappell testified that Mr. Traweek used two email addresses – explicitcure2008@yahoo.com and besttrader69@gmail.com. Screenshots from both accounts are included in Exhibit 6-4.

evidence, such as the evidence of his imgsrc account or email conversations with others, which took place on other dates, constitutes an impermissible constructive amendment of the indictment.

"A constructive amendment occurs when the government changes its theory during trial so as to urge the jury to convict on a basis broader than that charged in the indictment, or when the government is allowed to prove 'an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment.'" *United States v. Girod*, 646 F.3d 304, 316 (5th Cir. 2011) (quoting *United States v. Robles-Vertiz,* 155 F.3d 725, 728 (5th Cir.1998)); *see also United States v. Reasor*, 418 F.3d 466, 475 (5th Cir. 2005) ("An implicit or constructive amendment of the indictment, constituting reversible error, occurs when it permits the defendant to be convicted upon a factual basis that effectively modifies an essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than that with which she was charged."). In the seminal case on this issue, *United States v. Stirone*, the Supreme Court held that, where an indictment charged the defendant with unlawfully interfering with interstate commerce with respect to importation of sand and other materials, it was error to admit evidence that the defendant interfered with steel exports. 361 U.S. 212, 214–15 (1960). The Court found that it defeated the protection a grand jury was designed to afford if a defendant could be subject to prosecution for a kind of interference with interstate commerce that the grand jury did not charge. *Id.* Similarly in *Reasor*, the defendant was charged with forging securities of St. Dominic's Catholic Church. 418 F.3d at 469–70. On appeal, the government argued that the indictment should be read to instead charge the defendant with forging securities of the bank used by the church, allowing the bank to "stand in as the organization in interstate commerce." *Reasor*, 418 F.3d at 474. The Fifth Circuit

rejected this argument because "only a grand jury can amend an indictment to broaden it." *Id.* at 475. The *Reasor* court contrasted the case before it with *United States v. Wade*, 266 F.3d 574 (6th Cir. 2001), and *United States v. Jackson*, 155 F.3d 942 (8th Cir. 1998). In the latter cases, "the indictment was written in broad generic terms closely tracking the statute." *Id.* Thus, the government "was afforded the freedom of proving the elements of the crime in alternative ways; whereas the Reasor indictment provided but one factual pattern which the government was required to satisfy in the factual basis." *Id.*

Unlike in *Reasor*, the indictment in this case is not limited to a specific theory or set of facts. Count Three of the indictment, distribution of child pornography, alleges that "[o]n or about September 21, 2013, . . . . [Mr. Traweek] did knowingly distribute and cause to be distributed any material that contains child pornography using any means and facility of interstate and foreign commerce by any means including [a] computer." (Doc. No. 10 at 3–4.) As written, the indictment is broad. It charges Mr. Traweek with the distribution of "any material that contains child pornography," not with the distribution of two particular images to a specific individual. Therefore, the Government's evidence that Mr. Traweek uploaded and shared additional images is neither broader than the indictment nor an alternative basis of proof.

Moreover, as the Fifth Circuit made clear in *Girod*, "an allegation as to the time of the offense is not an essential element of the offense charged in the indictment and, 'within reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient.'" *Girod*, 646 F.3d at 316 (quoting *Russell v. United States*, 429 F.2d 237, 238 (5th Cir. 1970) (per curiam)). In *Girod*, the Fifth Circuit approved a four-month variance from the date charged in the indictment. *Id.* at 317. The Government's allegation that

Mr. Traweek's distribution offense occurred between August 19, 2013, and October 13, 2013, falls well within the timeframe permitted by *Girod*.

Mr. Traweek argues that *Robles-Vertiz*, a case which preceded *Reasor* and *Girod*, supports his contention that the admission of other evidence on Count Three of the indictment constitutes a constructive amendment. Mr. Traweek is correct that, in its constructive amendment analysis, *Robles-Vertiz* does allude to the evidence presented *to the grand jury*. Although the *Robles-Vertiz* court ultimately held that the indictment had not been amended, it noted that in a slightly different circumstance, "the government would be prosecuting a theory that it had not presented to the grand jury." *Robles-Vertiz*, 155 F.3d at 729. This would be impermissible. The court also described two prior cases, *United States v. Salinas*, 654 F.2d 319 (5th Cir. 1981), and *United States v. Adams*, 778 F.2d 1117 (5th Cir. 1985), as illustrations that "the government may not obtain an indictment alleging certain material elements or facts of the crime, then seek a conviction on the basis of a different set of elements or facts." *Id.* at 728.

Although *Robles-Vertiz* references the evidence presented to the grand jury, the constructive amendment analysis in all three cases — *Robles-Vertiz*, *Salinas*, and *Adams* — focuses exclusively on the language of the *indictment*. As the *Robles-Vertiz* court itself notes, the Fifth Circuit has "found constructive amendments in cases where the government alleges one theory of the case in the indictment, but argues another at trial." 155 F.3d at 728. This standard for constructive amendments is heavily supported by subsequent cases, such as *Girod* and *Reasor*, as well as the Supreme Court's original explication in *Stirone*. Ultimately, the passing references in *Robles-Vertiz* cannot overcome the clear weight of Fifth Circuit case law which does not pierce the indictment to consider the evidence presented to the grand jury, but instead considers whether the indictment itself was impermissibly amended at trial. Moreover, at issue in

*Robles-Vertiz* was a variation in the name of a person who was specifically listed in the indictment. 155 F.3d at 727. The court's focus, therefore, was on the difference between the language of the complaint and the evidence at trial, not, as Mr. Traweek argues, the difference between the evidence presented to the grand jury and the evidence presented at trial.

As the *Reasor* court rightly observed, an indictment written in general terms, like the indictment here, gives the government latitude to prove the elements of the crime in different ways. A contrary rule would force the government to marshal all of its evidence in support of the material elements of a crime before the grand jury or risk losing the ability to present it at trial. The Court finds no support for such a mandate in the case law.

Together, the evidence demonstrates beyond a reasonable doubt that Mr. Traweek knowingly transferred child pornography to others, by uploading the files to an album others could access and by sharing access to that album with others. The Government has met its burden as to this element.

    2.   Whether the Child Pornography Was Transported in Interstate Commerce

The aforementioned screenshots were taken from Mr. Traweek's computer, an Asus desktop, which was used to upload the images to Mr. Traweek's imgsrc account via the Internet. The Fifth Circuit has held that "transmission of photographs by means of the Internet is tantamount to moving photographs across state lines and thus constitutes transportation in interstate commerce." *United States v. Runyan*, 290 F.3d 223, 239 (5th Cir. 2002) (quoting *United States v. Carroll*, 105 F.3d 740, 742 (1st Cir. 1997)). "The Government must make a specific connection between the images introduced at trial and the Internet to provide the requisite jurisdictional nexus." *Id.* at 242. Circumstantial evidence linking a particular image to

the Internet, such as the presence of a website address embedded within the image, may be sufficient evidence of interstate transportation. *Id.*

Here, this jurisdictional nexus is clear. The screenshots from Mr. Traweek's computer indicate that he uploaded the images to an online album to share with other users of imgsrc. He then emailed the password to his album to at least one other individual. This conduct establishes that Mr. Traweek transported the images in interstate commerce, via the Internet.

3. Whether Mr. Traweek Knew the Distributed Materials Contained Child Pornography

The final element the Government must prove beyond a reasonable doubt is whether Mr. Traweek knew the materials he distributed contained child pornography. There is ample evidence of Mr. Traweek's knowledge.

The images Mr. Traweek uploaded to his imgsrc account are snapshots from the hidden camera videos of B.F. and S.J. The snapshots Mr. Traweek created from the videos are those images in which the children are nude, with their buttocks or genitals visible to the viewer. Mr. Traweek did not upload snapshots of moments in the videos during which the girls are clothed or off-screen, although there are many such moments in the videos. Instead, he exclusively uploaded images of their genitals and buttocks. Moreover, Mr. Traweek labeled this album with the keywords, "[d]aughter, kids, nude, [and] preteen." Another screenshot in Exhibit 6-4 demonstrates that imgsrc allows users to search for albums or images with particular keywords, and that Mr. Traweek himself searched for albums "in [the] section 'kids'." *Cf. United States v. Kimbrough*, 69 F.3d 723, 733 (5th Cir. 1995) (noting in the context of sentencing that description of a file as "Preteen School Girl" is evidence that defendant intended to receive materials involving prepubescent minors). Thus, Mr. Traweek's choice of labels suggests that he intended

other users to be able to find his images through the keywords "[d]aughter, kids, nude, [and] preteen."

Finally, Mr. Traweek's statements in his email conversations with others about trading images indicate that he was aware the materials were child pornography. Mr. Traweek told "in sign," "jailbait stuff is awesome," and asked "Joseph Smith," "[h]ave any more of yours? If not then sc[11] nude around 10 yo." (Ex. 6-4.) Special Agent Chappell testified that the phrasing "yo" typically stands for years old. Therefore, in his email conversation with "Joseph Smith," Mr. Traweek discussed trading nude images of children who are about ten years old. Although neither of these statements explicitly references the child pornography in Mr. Traweek's imgsrc album, "step daughter," they provide further evidence that he was aware of both the content of the images and the age of the children depicted within them. The Court finds that the Government has met its burden on this element.

### V. CONCLUSION

In sum, the Court finds the defendant, Troy Ray Traweek, **GUILTY** of the three counts charged in the indictment.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 14th day of October, 2015.

THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[11] Special Agent Chappell testified that the term "hc" stands for hard core. (Tr. 121:15-17.) Although Special Agent Chappell did not explain the term "sc," the Court understands it to mean soft core.